**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANTHONY M. GONTARZ, *on behalf of himself and all others similarly situated*,<br><br>c/o Dechert LLP<br>1900 K Street NW<br>Washington, DC 20006,<br><br>          Plaintiff,<br><br>    v.<br><br>PETE HEGSETH, *in his official capacity as United States Secretary of Defense*<br>1000 Defense Pentagon<br>Washington, DC 20301-1000,<br><br>HUNG CAO, *in his official capacity as Acting Secretary of the United States Navy*<br>1000 Navy Pentagon<br>Washinton, DC 20350-1000,<br><br>DANIEL DRISCOLL, *in his official capacity as Secretary of the United States Army*<br>101 Army Pentagon<br>Washington, DC 20310-0101,<br><br>TROY E. MEINK, *in his official capacity as Secretary of the United States Air Force*<br>1670 Air Force Pentagon<br>Washington, DC 20330-1670,<br><br>and MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*<br>2707 Martin Luther King Jr Ave SE<br>Washington, DC 20528-0525,<br><br>          Defendants. | Case No.: 1:26-cv-1396<br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Over 770,000 Americans serve in a Reserve Component of the United States Armed Forces—the Army Reserve, Army National Guard, Navy Reserve, Marine Corps Reserve, Air Force Reserve, Air National Guard, and Coast Guard Reserve.  These Reserve Component servicemembers are not a peripheral force.  Since the terrorist attacks of September 11, 2001, the Reserve Components have been mobilized at historically unprecedented levels,  serving prolonged periods in roles indistinguishable from their active duty counterparts and evolved into an operational force that the Nation relies on for sustained global and domestic missions.

2.      For more than two decades, Reserve Component servicemembers have consistently answered the Nation's call—deploying overseas, supporting combat operations, conducting homeland defense, responding to the COVID-19 pandemic and natural disasters, and performing other sustained federal missions.  In doing so, they and their families have borne the recurring burdens of repeated separations, disrupted civilian employment, and prolonged absences from home.  When a Reserve Component servicemember returns from active duty, the abrupt transition back to civilian life frequently brings significant uncertainty, including whether civilian employment will resume promptly or at all, whether income will stabilize, and whether the servicemember and their family will have continued access to healthcare.

3.      Congress addressed that risk directly by creating the Transitional Assistance Management Program ("TAMP"), codified in 10 U.S.C. § 1145.  That law guarantees Reserve Component servicemembers eligibility for 180 days of premium-free medical and dental coverage following the end of a qualifying period of active duty.  *See* 10 U.S.C. § 1145(a)(2)(B). The statute provides that a Reserve Component member who is "separated from active duty" after being "called or ordered [to active duty] under section 12304b of this title or a provision of law referred

1

to in section 101(a)(13)(B) of this title" is entitled to receive health benefits "if the active duty is active duty for a period of more than 30 days." By incorporating section 101(a)(13)(B) of Title 10, Congress defined qualifying service to include activation "during a national emergency declared by the President or Congress." By cross-referencing 10 U.S.C. § 101(a)(13)(B), Congress made clear that qualifying service includes any activation of more than 30 days during a national emergency declared by the President or Congress without regard to the type of active duty service.

4.      In enacting TAMP, Congress addressed a core vulnerability in the demobilization process: the risk that a servicemember or dependent will lose access to medical and dental care at the very moment they transition back to civilian life. TAMP reduces financial strain, prevents gaps in treatment, and protects both individual welfare and overall military readiness. It further reflects Congress's judgment that those who answer the call to serve should not be left vulnerable when their active duty orders end.

5.      This case arises because the Department of Defense ("DoD")[1] has implemented and enforced a contrary, extra-statutory policy that denies TAMP to otherwise eligible servicemembers based on an internal administrative coding requirement. Specifically, DoD conditions eligibility for TAMP for those Reserve Component servicemembers who serve more than 30 consecutive days of active duty on whether a servicemember's orders are coded as "in support of a contingency operation" in the Defense Enrollment Eligibility Reporting System ("DEERS"), the DoD's internal system for tracking personnel status and benefits eligibility. That requirement does not appear in the statute. Instead, it is imposed through DoD's implementing regulation, 32 C.F.R. § 199.3(e)(1)(ii), and reinforced through DoD policy and guidance, including the TRICARE Policy

---

[1] The Department of Defense is also referred to as the Department of War. Pursuant to a September 5, 2025 Executive Order, the Department of Defense was renamed the Department of War. On information and belief, by statute the Department of Defense's official name remains the Department of Defense until modified by Congress.

Manual, which makes DEERS coding dispositive of eligibility determinations. The military departments and Coast Guard are bound to apply this uniform, centrally administered framework and lack discretion to depart from it. As a result, Reserve Component servicemembers who serve more than 30 consecutive days during a declared national emergency are categorically denied TAMP unless their orders contain the required contingency-operation coding.

6. Plaintiff Anthony Gontarz—a Lieutenant Commander (LCDR) in the United States Navy Reserve—is one of many such Reserve Component servicemembers who have been directly harmed by this unlawful DoD policy. After serving on active duty orders for over 1,400 consecutive days (nearly 4 years), LCDR Gontarz was denied TAMP solely because his orders were not coded in DEERS as "in support of a contingency operation."

7. DoD's contingency-coding policy, and its application to LCDR Gontarz and countless others, constitute final agency actions reviewable under 5 U.S.C. § 704. The policy is a definitive and binding rule that DoD uses to determine TAMP eligibility for Reserve Component servicemembers, leaving no discretion for deviation by military departments within DoD and the Coast Guard and marking the consummation of DoD's decision-making process regarding how 10 U.S.C. § 1145 must be applied. The denial of TAMP eligibility to LCDR Gontarz—issued pursuant to this policy just months ago—also constitutes a final agency action.

8. Accordingly, LCDR Gontarz brings this action, on his own behalf and on behalf of all similarly situated members of a Reserve Component pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), seeking declaratory and injunctive relief because Defendants' uniform policy and practice unlawfully deprives Reserve Component servicemembers of eligibility determinations consistent with 10 U.S.C. § 1145(a)(2)(B) and denies transitional healthcare coverage based on criteria not authorized by statute. Defendants' actions are arbitrary

3

and capricious, not in accordance with law, exceed their statutory authority, and constitute agency actions that must be set aside under 5 U.S.C. § 706.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the APA, 5 U.S.C. §§ 701-706, and under laws governing the United States military, 10 U.S.C. §§ 1145(a)(2)(B), 12301(d).

10.      This Court is authorized to grant the relief requested pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

11.      Venue in this Court is proper under 28 U.S.C. § 1391(e) because Defendants—the Honorable Pete Hegseth in his official capacity as Secretary of the Department of Defense and the Honorable Markwayne Mullin in his official capacity as Secretary of Homeland Security—are officers of the United States who perform a substantial portion of their official duties in the District of Columbia.  Venue is also independently proper under 28 U.S.C. § 1391(e) because the Secretary of Homeland Security resides in the District of Columbia in his official capacity.

12.      Defendants' TAMP-eligibility determinations constitute final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.  Additionally, Defendants' adoption of a policy that denies TAMP coverage to members of a Reserve Component who served on active duty for more than 30 days during a declared national emergency, unless the servicemembers' orders were administratively coded as "in support of a contingency operation" in DEERS, constitutes final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

## PARTIES

13.      Plaintiff Anthony Gontarz is a citizen of the United States, a veteran of the United

States Navy, a Lieutenant Commander in the Navy Reserve, and a resident of Philadelphia, Pennsylvania.

14.    Defendant Pete Hegseth, 1000 Defense Pentagon, Washington, DC 20301-1000, is the Secretary of Defense, and is sued in his official capacity.  The Secretary is the head of DoD.  DoD is an agency of the United States as defined by the APA, 5 U.S.C. § 701(b)(1), and for purposes of venue as described in 28 U.S.C. § 1391(e)(1).

15.    Defendant, Hung Cao, 1000 Navy Pentagon, Washington, DC 20350-1000, is the Acting Secretary of the United States Navy, which is a military department within DoD, and is sued in his official capacity.

16.    Defendant, Daniel Driscoll, 101 Army Pentagon, Washington, DC 20310-0101, is the Secretary of the United States Army, which is a military department within DoD, and is sued in his official capacity.

17.    Defendant, Troy E. Meink, 1670 Air Force Pentagon, Washington, DC 20330-1670, is the Secretary of the United States Air Force, which is a military department within DoD, and is sued in his official capacity.

18.    Defendant Markwayne Mullin, Department of Homeland Security, 2707 Martin Luther King Jr Ave SE, Washington, DC 20528-0525, is the Secretary of the United States Department of Homeland Security and is sued in his official capacity.  The Secretary is the head of the Department of Homeland Security ("DHS").  DHS has statutory authority over the United States Coast Guard, including the Coast Guard Reserve.  DHS is an agency of the United States as defined by the APA, 5 U.S.C. § 701(b)(1), and for purposes of venue as described in 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

**A.    The Transitional Assistance Management Program**

19.    Servicemembers of any Reserve Component serving on active duty and their families receive medical and dental coverage through TRICARE, DoD's healthcare program.

20.    TRICARE typically has significantly lower premiums, lower deductibles, and a lower catastrophic cap compared to private, employer-provided health care plans.  Participants have access to both military hospitals and clinics, as well as a worldwide network of civilian providers.  Unlike many private health care plans, TRICARE often does not require referrals to see specialists.  TRICARE also acts as a secondary payer to other health insurance.

21.    Upon separation after more than 30 days of qualifying active duty, Congress provides 180 days of transitional premium-free TRICARE medical care and dental benefits to certain Reserve Component servicemembers through TAMP, 10 U.S.C. § 1145(a)(4).  TAMP coverage begins automatically on the date the servicemember is released from a qualifying period of active service and applies to both the servicemember and eligible family members.

### Purpose of TAMP

22.    Congress created TAMP in the National Defense Authorization Act for Fiscal Year 1993 as part of a broader effort to help servicemembers during post-Cold War force reductions. At that time, TAMP was a temporary benefit providing a more limited (60 to 120 days) window of healthcare, primarily for servicemembers involuntarily separated from active duty.

23.    The modern 180-day structure of TAMP was largely shaped by the operational demands of the Global War on Terror.  In the early 2000s, Congress extended transitional healthcare coverage under TAMP to 180 days to support the surge of Reserve and National Guard servicemembers returning from deployment in Afghanistan and Iraq.  Congress recognized that

6

separating servicemembers and families often faced immense difficulties in transferring to an insurance plan once they were separated from active duty service, especially if the servicemember or family member suffered from a disability or ongoing illness.

24.    Recognizing that most of the servicemembers had a strong and continued desire to serve and at the time were part of an "all-volunteer force," Congress wanted to ensure a host of transitional incentives, including transitional healthcare.    During this 180-day window, beneficiaries are treated similarly to active duty servicemembers regarding cost-sharing and deductibles, allowing Reserve Component servicemembers and their families to continue seeing providers and receiving necessary treatments without the immediate burden of private insurance premiums.    TAMP ensures that families do not experience a sudden loss of medical and dental coverage during the high-stress period immediately following separation from active service.

**Statutory Eligibility**

25.    TAMP eligibility is defined by statute.    As relevant here, 10 U.S.C. § 1145(a)(2)(B) confers TAMP benefits on "[a] member of a reserve component who is separated from active duty to which called or ordered under section 12304b of this title or a provision of law referred to in section 101(a)(13)(B) of this title if the active duty is active duty for a period of more than 30 days."    10 U.S.C. § 1145(a)(2)(B).    By reference to 10 U.S.C. § 101(a)(13)(B), Section 1145(a)(2)(B) incorporates the statutory definition of a "contingency operation" which includes a "military operation that . . . results in the call or order to . . . active duty of members of the uniformed services under . . . any other provision of law . . . during a national emergency declared by the President or Congress."

26.    Prior to 2018, Section 1145(a)(2)(B) limited eligibility to servicemembers "called or ordered in support of a contingency operation."    In the National Defense Authorization Act for

7

Fiscal Year 2018, Congress deliberately removed that limitation, amending Section 1145(a)(2)(B) so that TAMP eligibility instead turns on whether a Reserve Component servicemember was activated for more than 30 days "under section 12304b of this title or any provision referred to in section 101(a)(13)(B) of this title." As amended, the statute unambiguously provides TAMP benefits to any Reserve Component servicemember who served on active duty for more than 30 days during a declared national emergency, without regard to whether the orders explicitly reference, or are coded as in "support of a contingency operation." Notably, in enacting this amendment, Congress chose to retain the phrase "in support of a contingency operation" for active duty separations covered by Section 1145(a)(2)(C) and (D), underscoring that Congress knows how to impose such a limitation on active duty separations when it intends to do so and affirmatively elected not to do so in Section 1145(a)(2)(B).

**DoD's Implementing Guidance and Ultra Vires Contingency Coding Requirements**

27. Despite Congress's explicit removal of any requirement that a Reserve Component servicemember be called to active duty "in support of a contingency operation," DoD continues to impose narrower, extra-statutory criteria for TAMP eligibility. In practice, DoD conditions eligibility for Reserve Component servicemembers and their families on whether a servicemember's active duty orders contain specific "contingency operation" language—a requirement Congress eliminated in 2018.

28. For example, DoD's implementing regulation, 32 C.F.R. § 199.3(e)(1)(ii), continues to restrict TAMP to members of a Reserve Component "separated from active duty called or ordered in support of a contingency operation" for more than 30 consecutive days. This language mirrors the superseded statutory text that Congress deliberately eliminated and unlawfully narrows eligibility in direct conflict with Section 1145(a)(2)(B).

29.     DoD policy documents further embed these extra-statutory restrictions.  DoD's TRICARE Policy Manual states that a servicemember qualifies for TAMP only if separated after serving more than 30 consecutive days "either *in support of a contingency operation* or for a preplanned mission."  TRICARE Policy Manual 6010.63-M, April 2021 ("April 2021 TRICARE POLICY Manual"), Ch. 10 § 5.1, 2.1.2 (emphasis added).  The April 2021 TRICARE Policy Manual makes DEERS coding dispositive, providing that coverage under TAMP "must be based on DEERS determinations" and "contractors shall be responsible for confirming DEERS eligibility status." *Id.*, 2.3.

30.     DoD Manual 7730.69, Volume 1 further narrows TAMP eligibility by restricting the DEERS project codes that may be entered into a servicemember's Active Service Transaction File to a limited list of specified contingency operations and a small subset of designated national emergencies—thereby excluding many Reserve Component activations that plainly satisfy the statutory criteria in 10 U.S.C. §§ 1145(a)(2)(B) and 101(a)(13)(B). *See* DoDM 7730.69, Vol. 1, § 8.3(k), Table 10.  Because the Active Service Transaction File is used to determine entitlement to medical benefits under 10 U.S.C. § 1145, this DEERS-coding restriction operates to deny TAMP benefits to otherwise statutorily eligible servicemembers.

31.     DoD's own contemporaneous interpretation confirms that TAMP eligibility is driven by administrative coding within personnel systems.  In a formal response to a congressional inquiry from Senator Ron Wyden regarding DoD's implementation of TAMP, the Under Secretary of Defense for Personnel and Readiness issued a memorandum and accompanying directive explaining that "accurate and complete" personnel data submissions—including entries in the Active Service Transaction File—are the "keystone for ensuring TAMP eligibility," and that those data are used to assign eligibility within the DEERS.  This guidance demonstrates that DoD has

9

made eligibility turn on internal data coding and reporting mechanisms.

32.    These policies are implemented uniformly across DoD and the Coast Guard, ensuring consistent enforcement of this extra-statutory limitation.    Each of the military departments and the Coast Guard is obligated to implement, and in fact uniformly enforces, DoD's guidance governing TAMP eligibility.  By making eligibility turn on internal coding conventions guided by extra-statutory restrictions rather than the statutory criteria enacted by Congress, Defendants have replaced the governing legal standard with an administrative proxy that has no basis in Section 1145(a)(2)(B).

## Supreme Court Invalidates DoD Interpretation

33.    The United States Supreme Court has rejected similar attempts by agencies to impose extra-statutory limitations on benefits for reservists triggered by active duty service pursuant to "a provision of law" listed in § 101(a)(13)(B) during (or at the same time) of a declared national emergency.  In *Feliciano v. Department of Transportation*, 605 U.S. 38 (2025), the Supreme Court held that "[a] federal civilian employee called to active duty pursuant to 'any other provision of law . . . during a national emergency' as described in § 101(a)(13)(B) is entitled to differential pay if the reservist's service temporally coincides with a declared national emergency without any showing that the service bears a substantive connection to a particular emergency." 605 U.S. 38, 39 (2025).

34.    *Feliciano* strongly supports the precise interpretative question at issue in this case. Like the statute at issue in *Feliciano*, Section 1145(a)(2)(B) incorporates § 101(a)(13)(B) and ties eligibility to service performed during a declared national emergency.  The Court's reasoning makes clear that Congress triggered TAMP eligibility based on the existence of a national emergency during the period of active duty, and not whether the service member was activated in

10

*connection* with, or in support of, a national emergency or any named contingency operation. Defendants' contingency- or national emergency-connection requirement therefore imposes an extra-statutory limitation that exceeds their statutory authority and conflicts with the eligibility criteria enacted by Congress.

**B.     Plaintiff Anthony Gontarz Has Been Harmed by Defendants' Unlawful Policies and Practices**

**Military Service Record**

35.     LCDR Gontarz enlisted in the United States Navy on August 31, 2004 as a Seaman. Over the past two decades, he has served his country with distinction in various capacities. Throughout his service, LCDR Gontarz has received numerous medals, campaign ribbons, and awards in recognition of his exemplary service. For example, in September 2022, LCDR received the Navy and Marine Corps Achievement medal for active duty service with the Military Sealift Command. In July 2025 at the end of his service stint at the Naval Surface Warfare Center, Port Hueneme Division, he was awarded the Navy and Marine Corps Commendation Medal.

36.     LCDR Gontarz advanced through the Navy ranks, starting with a promotion to Petty Officer Third Class in 2005, becoming an officer candidate in 2007, and culminating in a promotion to Lieutenant in 2014 prior to joining the Navy Reserve. Supervisors consistently described him as "an outstanding addition to the fleet," a "hard working and knowledgeable officer," and a "highly effective and efficient leader."

37.     In August 2014, following active duty service, LCDR Gontarz voluntarily joined the Selected Navy Reserve, where he continued to excel. In 2019, he was promoted to Lieutenant Commander.

**LCDR Gontarz is called to active duty service under 10 U.S.C. § 12301(d) from November 15, 2021, continuously through September 30, 2025**

38.     Since joining the Navy Reserve, LCDR Gontarz has been activated for multiple

11

periods of active duty.  His most recent and extended period of active duty service began on November 15, 2021, under Active Duty For Operational Support ("ADOS") orders issued pursuant to 10 U.S.C. § 12301(d).  His initial ADOS orders ran through September 30, 2022.  Upon activation, LCDR Gontarz was assigned to the Military Sealift Command, Ship Support Unit, Yokohama, Japan, where he began full-time active duty service.

39.    The Navy issued multiple modifications and follow-on Section 12301(d) orders extending LCDR Gontarz's active duty service beyond the original end date.  These additional orders transferred him to the Naval Surface Warfare Center, Port Hueneme Division, where he continued to serve in a full-time active duty status without any break in active duty service through September 30, 2025.

40.    At all times from November 15, 2021 through September 30, 2025, LCDR Gontarz served under the statutory authority of 10 U.S.C. § 12301(d) and for this entire period, the United States remained under a declared national emergency pursuant to Presidential Proclamation 7463, originally issued in response to the attacks of September 11, 2001, and repeatedly continued under the National Emergencies Act, 50 U.S.C. § 1622 (d).

<b>Denial of TAMP Eligibility After Separation</b>

41.    On September 30, 2025, LCDR Gontarz separated from active duty service.  On October 3, 2025, the Defense Health Agency (DHA) notified him, by letter, that he was disenrolled from TRICARE effective September 30, 2025, because DHA's records indicated that he was no longer eligible for TRICARE, as "determined by information in DEERS . . . ."

42.    Thereafter, LCDR Gontarz contacted the Navy Reserve DEERS/RAPIDS Project Office ("NRPO") to inquire about access to TAMP.  On October 21, 2025, NRPO responded to his TAMP-inquiry asserting that his "orders do not qualify for TAMP" because "[n]ormally

12

ADSW/ADOS and ADT orders to not qualify unless written specifically per the Title 10 instruction guidelines." NRPO further directed LCDR Gontarz to consult the TRICARE Policy Manual 6010.57-M (Feb. 1, 2008) as the basis for the Navy's determination. The referenced manual states that a "member of a Reserve Component (RC) who is separated from active duty to which called or ordered in support of a contingency operation if the active duty is for a period of more than 30 days" is eligible for TAMP and that "[e]ligibility verification . . . shall be based solely on the DEERS response." The TAMP eligibility criteria for Reserve Component members in the 2008 Tricare Manual are not materially different from those in the current April 2021 TRICARE Policy Manual.

43. On October 22, 2025, in response to LCDR Gontarz's inquiry regarding the basis for denying his TAMP eligibility, NRPO again asserted that "[n]ormally ADSW/ADOS and ADT orders to not qualify unless written specifically per the Title 10 instruction guidelines."

44. On October 28, 2025, LCDR Gontarz requested appellate review from the My Navy Career Center ("MNCC"), explaining that he "would like to appeal the denial of . . . TAMP" and requesting clarification whether review was available within the Navy or whether the denial constituted final agency action appealable only to the Board of Corrections of Naval Records ("BCNR"). *Id.* A MNCC agent informed him by telephone no further action was available, including an appeal to the BCNR.

45. As a direct consequence of the Navy's determination that he was ineligible for TAMP based on criteria not found in the governing statute, despite meeting all statutory requirements, LCDR Gontarz was denied the benefit of a lawful eligibility determination under 10 U.S.C. § 1145(a)(2)(B), including the opportunity to receive transitional TRICARE coverage administered in accordance with statute. As a result, he incurred significant out-of-pocket

expenses, including bi-weekly premiums that he would not have borne had he received the 180 days of transitional TRICARE coverage guaranteed to him by 10 U.S.C. § 1145(a)(2)(B).

## CLASS ACTION ALLEGATIONS

46.    LCDR Gontarz seeks equitable relief pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on his own behalf and on behalf of all other persons similarly situated.

47.    LCDR Gontarz seeks to represent a "Proposed Class" defined as:

All current and former members of a Reserve Component of the United States Armed Forces who (a) were or will be separated from active duty following a period of active duty exceeding thirty (30) days under any provision of law, including 10 U.S.C. § 12301(d), during a national emergency declared by the President of the United States or the United States Congress and (b) were or will be denied TAMP coverage on the ground that they were deemed ineligible as reflected in DEERS because their active duty service was not coded as "in support of a contingency operation" (or otherwise not coded to satisfy DoD's contingency-operation eligibility screen).

48.    The Proposed Class satisfies each requirement of Federal Rule of Civil Procedure 23.

49.    Numerosity.  On information and belief, the numerosity requirement of Federal Rule of Procedure 23(a)(1) is satisfied because the Proposed Class is so numerous that joinder of all members is impracticable.  Although the precise number of proposed class members is not yet known to LCDR Gontarz, the information currently available to him and his counsel indicates that the numerosity requirement is satisfied.  Moreover, the size of the proposed class continues to grow as the policy is applied on an ongoing, prospective basis.  Based on available information, LCDR Gontarz can now plead:

a.    As of January 31, 2026, there were over 770,000 members of the active

14

Reserve Component across the Army National Guard, Army Reserve, Navy Reserve, Marine Corps Reserve, Air National Guard, Air Force Reserve, and the Coast Guard Reserve (*i.e.*, the population from which the Proposed Class members are drawn).  Each member of a Reserve Component is subject to a call to active duty as needed.

b.  Congress annually authorizes large numbers of Reserve Component personnel to serve on full-time operational support duty.  The National Defense Authorization Act for Fiscal Year 2026, signed into law by the President on December 18, 2025, authorizes a total of 69,200 Reserve Component personnel to be on active duty for operational support.

c.  On information and belief, tens of thousands of members of the Reserve Components are on active duty at any given moment, supporting the needs of the U.S. military worldwide.

50.  <u>Commonality</u>.  The commonality requirement of Federal Rule of Procedure 23(a)(2) is satisfied because this case presents a common and dispositive legal question: whether Reserve Component service members who served on active duty for more than thirty days under a qualifying provision of law during a declared national emergency are eligible for TAMP under 10 U.S.C. § 1145(a)(2)(B) upon separation from active duty service, without regard to contingency-operation coding, labelling, characterization, or specificity.  This action challenges a uniform, centrally administered policy—memorialized in 32 C.F.R. § 199.3(e)(1)(ii) and implemented through DoD guidance—that conditions TAMP eligibility on "contingency operation" status reflected in DEERS (the "DEERS-Coding Policy").  The DEERS-Coding Policy is applied categorically and without individualized assessment across all military departments and

15

the Coast Guard.  Accordingly, resolution of these questions will turn on Defendants' uniform policies, statutory authority, and administrative practices—not on individualized circumstances of any particular servicemember.

51.    Typicality.  The typicality requirement of Federal Rule of Procedure 23(a)(3) is met as the claims of LCDR Gontarz are typical of the claims of the Proposed Class.  LCDR Gontarz and all Proposed Class members were injured by the same wrongful acts, omissions, policies and practices of Defendants described in this Complaint.  LCDR Gontarz's claims arise from the same policies, practices, actions, and course of conduct that give rise to the claims of the Proposed Class members and are based on the same legal theories.  Accordingly, LCDR Gontarz's claims are typical of—and coextensive with—those of the Proposed Class, satisfying Rule 23(a)(3).

52.    Adequacy.  The adequacy requirement of Federal Rule of Procedure 23(a)(4) is met as LCDR Gontarz will fairly and adequately protect the interests of the Proposed Class.  LCDR Gontarz has no interest adverse to the interests of the Proposed Class and is represented by competent counsel experienced in class actions and military servicemembers' and veterans' matters.

53.    This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Proposed Class by enforcing a uniform, nationwide policy governing TAMP eligibility.  Defendants apply the challenged TAMP eligibility criteria categorically through centralized rules and systems, without individualized assessment.  Plaintiff seeks declaratory and injunctive relief setting aside that policy and requiring Defendants to apply the governing statute.  A single class wide judgment would provide relief to all class members in one stroke, while ensuring consistent, lawful application of TAMP benefits nationwide.  Class wide adjudication thus both prevents

16

incompatible legal obligations for Defendants and secures uniform, prospective relief for similarly situated servicemembers and their families.

54. LCDR Gontarz and the Proposed Class seek no monetary damages.

## ADMINISTRATIVE PROCEDURE ACT VIOLATIONS

### Claim 1: DEERS-Coding Policy is Unlawful
### (Violation of 5 U.S.C. § 706(2)(A) & (C))

55. LCDR Gontarz incorporates by reference the allegations in paragraphs 1 through 54 above.

56. Federal statute—10 U.S.C. § 1145(a)(2)(B)—establishes the criteria governing TAMP eligibility for a "member of a reserve component who is separated from active duty to which called or ordered under section 12304b of this title or a provision of law referred to in section 101(a)(13)(B) of this title if the active duty is active duty for a period of more than 30 days." Section 101(a)(13)(B) specifies that one such provision of law is "any other provision of law during a war or during a national emergency declared by the President or Congress." In *Felciano v. Department of Transportation*, 605 U.S. 38 (2025), the Supreme Court held that 10 U.S.C. § 12301(d) constitutes "any other provision of law" under 10 U.S.C. § 101(a)(13)(B) and such active duty service need only temporally coincide with a declared national emergency without any showing that the service bears a substantive connection to a particular emergency.

57. Instead of following this statutory mandate, Defendant DoD has adopted, and all Defendants continue to enforce, the DEERS-Coding Policy under which Reserve Component servicemembers who served more than 30 consecutive days of active duty during a declared national emergency are categorically denied TAMP unless their orders are administratively coded in DEERS as "in support of a contingency operation," even where the servicemembers otherwise satisfy the statute's criteria (including service under 10 U.S.C. § 12301(d) during a national

emergency).

58.     DoD's DEERS-Coding Policy is definitive and binding, is applied by the military departments within DoD and Coast Guard without discretion, and marks the consummation of DoD's decision-making regarding how TAMP eligibility is adjudicated.  The policy determines rights and produces legal consequences by dictating TAMP eligibility outcomes and leaves further avenue for administrative review.  It therefore constitutes final agency action reviewable under 5 U.S.C. § 704.

59.     The DEERS-Coding Policy contravenes 10 U.S.C. § 1145(a)(2)(B) by imposing an extra-statutory contingency-coding prerequisite that Congress did not enact, thereby denying benefits to statutorily eligible servicemembers.

60.     As a direct and proximate result of Defendants' unlawful imposition of eligibility requirements not found in § 1145(a)(2)(B), LCDR Gontarz and the Proposed Class have been deprived—and continue to be deprived—TAMP eligibility determinations consistent with governing law and have been denied transitional healthcare coverage based on criteria not authorized by statute.  Accordingly, DoD's policy described herein is arbitrary and capricious, not in accordance with law, in excess of statutory authority, and short of statutory right, in violation of 5 U.S.C. § 706(2)(A) & (C).

61.     Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).  DoD's policy regarding TAMP eligibility criteria for members of the Reserve Component therefore must be set aside, and LCDR Gontarz is entitled to the relief requested below.

18

**Claim 2: TAMP Denial Decision was Unlawful**
**(Violation of 5. U.S.C. § 706(2)(A) & (C))**

62.     LCDR Gontarz incorporates by reference the allegations in paragraphs 1 through 61 above.

63.     LCDR Gontarz is a Lieutenant Commander in the United States Navy Reserve who served on active duty orders for over 1,400 consecutive days during a declared national emergency, satisfying 10 U.S.C. § 1145(a)(2)(B)'s statutory criteria for TAMP eligibility.

64.     Despite meeting the statute's requirements, Defendant Secretary of Defense, acting through Defendant Secretary of the Navy, denied Plaintiff's TAMP eligibility solely because his orders were not administratively coded in DEERS as "in support of a contingency operation."

65.     The denial issued to LCDR Gontarz is a final agency action within the meaning of 5 U.S.C. § 704 because it consummated Defendants' decision-making process regarding Plaintiff's eligibility and immediately determined his rights and benefits under federal law.

66.     As a direct and proximate result of Defendants' unlawful imposition of eligibility requirements not found in § 1145(a)(2)(B), LCDR Gontarz and the Proposed Class have been deprived—and continue to be deprived—of TAMP eligibility determinations consistent with governing law and have been denied transitional healthcare coverage based on criteria not authorized by statute. Accordingly, Defendants' denials as to LCDR Gontarz and the Proposed Class pursuant to the unlawful DEERS-Coding Policy are arbitrary, capricious, not in accordance with law, in excess of statutory authority, and short of statutory right, in violation of 5 U.S.C. § 706(2)(A) & (C).

67.     Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or

19

limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).  DoD's denials as to LCDR Gontarz and the Proposed Class pursuant to the unlawful DEERS-Coding Policy therefore must be set aside, and LCDR Gontarz is entitled to the relief requested below.

## PRAYER FOR RELIEF

LCDR Gontarz and the Proposed Class members he represents respectfully requests that this Court enter judgement against Defendants and award the following relief:

1.      Enter an order pursuant to Federal Rule of Civil Procedure 23 that this action may be maintained as a class action;

2.      Designate LCDR Gontarz as the representative of the Proposed Class;

3.      Designate Plaintiff's Counsel as Class Counsel;

4.      Declare that DoD's policy implementing 10 U.S.C. § 1145(a)(2)(B) that restricts TAMP eligibility to members of a Reserve Component "separated from active duty called or ordered in support of a contingency operation" for more than 30 consecutive days is arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of 5 U.S.C. § 706(2)(A), (C), and 10 U.S.C. § 1145(a)(2)(B).

5.      Declare that Defendants' determinations denying TAMP healthcare benefits to LCDR Gontarz and each member of the Proposed Class who were called to and served on active duty for a period of more than thirty days during a national emergency declared by the President of the United States or United States Congress are arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of 5 U.S.C. § 706(2)(A), (C), and 10 U.S.C. § 1145(a)(2)(B).

6.      Declare that Defendants' actions have violated and continue to violate the legal

20

rights of LCDR Gontarz and the Proposed Class under 10 U.S.C. § 1145(a)(2)(B).

7.      Enter an order holding unlawful and setting aside under the APA, 5 U.S.C. § 706(2), Defendants' policy and practice of requiring active duty orders for servicemembers of the Reserve Component to be designated as "in support of a contingency operation" and that this designation be reflected as such by a specific duty-status code in DEERS in order for the servicemembers to be determined eligible for TAMP healthcare benefits;

8.      Grant relief to LCDR Gontarz and the Proposed Class by setting aside Defendants' TAMP-eligibility determination as to LCDR Gontarz and the Proposed Class;

9.      Grant appropriate specific relief directing Defendants to apply the statutory standard to LCDR Gontarz and the Proposed Class, including reprocessing eligibility determinations and administering TAMP eligibility consistent with 10 U.S.C. § 1145(a)(2)(B) and § 101(a)(13)(B).

10.     Grant injunctive relief by enjoining Defendants from applying their unlawful policy and practice going forward;

11.     Award Plaintiff's costs and attorneys' fees; and

12.     Grant such other and further relief as this Court deems just and proper.

Dated: April 24, 2026                    Respectfully submitted,

                                         /s/ John "Jay" Jurata Jr.
                                         **DECHERT LLP**
                                         John ("Jay") Jurata, Jr. (D.C. # 478602)
                                         Brian Hanna (D.C. # 90031791)
                                         1900 K Street NW
                                         Washington, D.C. 20006
                                         (202) 261-3440
                                         jay.jurata@dechert.com
                                         brian.hanna@dechert.com

                                         NATIONAL VETERANS LEGAL SERVICES
                                         PROGRAM
                                         Rochelle Bobroff (D.C. # 420892)
                                         Esther Leibfarth (D.C. # 10164515)
                                         Matthew Handley*
                                         1100 Wilson Blvd, Suite 900
                                         Arlington, VA 22209
                                         T: (202) 621-5677
                                         F: (202) 223-9199
                                         rochelle@nvlsp.org
                                         esther@nvlsp.org
                                         matthew.handley@nvlsp.org

                                         *Pro hac vice motion forthcoming

                                         *Attorneys for Plaintiffs*

22